**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KPH HEALTHCARE SERVICES, INC., A/K/A KINNEY DRUGS, INC., HEALTH DIRECT PHARMACY SERVICES, AND NOBLE HEALTH SERVICES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**JANSSEN BIOTECH, INC., JANSSEN ONCOLOGY, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC, and BTG INTERNATIONAL LIMITED,**<br><br>    **Defendants.** | Civ. No. 20-cv-05901 (KM) (ESK)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

      To extend its time as the sole seller of profitable prostate cancer drug brand-named Zytiga, Janssen Biotech ("Janssen"), along with BTG International Limited ("BTG"), obtained a follow-on patent that was later invalidated. Now, KPH Healthcare Services ("KPH"), alleging that Janssen's actions violated antitrust laws, seeks to represent a class of direct purchasers of Zytiga who allegedly overpaid for the drug during the period in which Janssen's actions delayed the entrance of generic versions of Zytiga into the market. Defendants move to compel arbitration and stay this district court case. (DE 51.)[1] For the following reasons, the motion to compel arbitration (DE

---

[1]  Certain citations to the record are abbreviated as follows:

    DE = docket entry in this case

    FAC = First Amended Complaint (DE 44)

    Mot. = Janssen's brief in support of its motion to compel arbitration (DE 55)

51) is **GRANTED,** a second motion to dismiss the complaint (DE 56) is **DENIED** as moot, and the case is **STAYED**.

I. **BACKGROUND**

In 1997, BTG obtained a patent on a compound called "abiraterone acetate." (FAC ¶ 91.) BTG licensed this patent to Cougar Biotechnology in 2004, and Cougar was purchased by Janssen in 2009. (*Id.* ¶ 92.) The compound is the key ingredient in Janssen's drug Zytiga, which was approved by the FDA in 2011. (*Id.* ¶ 104.) Zytiga proved useful in the treatment of prostate cancer, and it earned Janssen billions of dollars in sales revenue. (*Id.* ¶ 7–8.) This first patent, however, was set to expire in 2016. (*Id.* ¶ 7.) The likely result would be generic competition and decreased profits for Janssen, so Janssen tried for years to find a way to delay that competition. Its initial attempts to obtain a new patent on the combined use of abiraterone and a steroid, prednisone, were repeatedly rejected by the United States Patent and Trademark Office ("PTO") as obvious. (*Id.* ¶ 93–102, 105–110.) In 2013, Janssen was finally successful in obtaining a new patent, asserting arguments based, *inter alia,* on the commercial success of Zytiga. (*Id.* at ¶ 127–28.) Janssen, however, never disclosed to the PTO that Zytiga's commercial success could be attributable to the blocking effect of a patent that forbade any other company from manufacturing and selling a drug that contained abiraterone acetate. (*Id.* at ¶ 126.)

In 2015, a number of generic manufacturers filed Abbreviated New Drug Applications ("ANDAs") with the FDA, claiming that Janssen's new patent was invalid and that they should be able to sell generic versions of Zytiga when the first patent expired in 2016. (*Id.* ¶ 139–40.) Janssen, exercising its rights under the Hatch-Waxman Act, filed an infringement action against the generic manufacturers, triggering a 30-month stay of the approval of the ANDAs. (*Id.* ¶

---

Opp. = KPH's brief in opposition to Janssen's motion to compel arbitration (DE 63)

35, 141.)[2] After extended litigation, both the Patent Trial and Appeal Board ("PTAB") and this court determined that Janssen's second patent was invalid for obviousness. (*Id.* ¶ 175–212.)[3] That determination was upheld by the Federal Circuit (*Id.* ¶ 222–23).[4]

As a result of this extended litigation, KPH argues, Janssen invalidly and excessively delayed the entrance of generics into the market. (*Id.* ¶ 224–27.) As a result of the delay, direct purchasers paid much more for Zytiga than they would have paid for a generic substitute if generics had been available, as they should have been. (*Id.* ¶ 270, 277.) KPH alleges that Janssen's actions violate the Sherman Act, 15 U.S.C. §§ 1–2, and seeks to represent a class of direct purchasers. KPH is not itself a direct purchaser of Zytiga but brings this case as the assignee of a direct purchaser, McKesson Corporation. (*Id.* ¶ 19; Mot. at 8–9.) As such, KPH "stands in the shoes" of McKesson in all relevant respects: it can only bring claims that McKesson could have brought and is bound by any restrictions that limited McKesson's ability to sue. *James Talcott, Inc. v. H. Corenzwit & Co.*, 76 N.J. 305, 309–10 (1978).[5]

Here, the relevant restriction is the dispute resolution clause included in McKesson's Distribution Agreement with Janssen to distribute Zytiga and other Janssen drugs. (DE 54.) That clause reads in pertinent part as follows:

> In the event of a dispute arising between the parties regarding this Agreement and prior to commencement of escalated action set forth below, the parties shall attempt in good faith to amicably resolve such dispute by good faith settlement discussions…. In the event the above settlement discussions are ineffective, any controversy or claim arising out of or relating to this Agreement between the parties (including without limitation any controversy

---

[2] The suit was *BTG Int'l Ltd., et al., v. Amneal Pharmaceuticals LLC, et al.*, 15-cv-5909 (D.N.J.).

[3] *BTG Int'l Ltd. v. Amneal Pharms. LLC*, 352 F. Supp. 3d 352 (D.N.J. 2018).

[4] *BTG Int'l Ltd. v. Amneal Pharms. LLC*, 923 F.3d 1063 (Fed. Cir. 2019).

[5] The assignment agreement between McKesson and KPH specifically states that the assignment exists "only to the extent the cause of action arises from McKesson's purchase of Zytiga that were subsequently resold to Customer." (DE 52 ¶ 1.)

> or claim relating to this Agreement involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a "Dispute")), shall first be submitted to mediation. … Any Dispute that cannot be resolved by mediation… shall be resolved by arbitration.

(*Id.* §§ 4.16(a)-(b).)[6]

Defendants are currently litigating several related cases involving Zytiga. By order entered July 1, 2020, the briefing schedule in this case was tied to the appointment of class counsel and creation of a leadership structure in two related cases. (DE 23.)[7] Class counsel was appointed and a leadership structure created on February 10, 2021. *See Louisiana Health Serv. & Indem. Co. v. Janssen Biotech Inc.*, 2021 WL 486895 (D.N.J. Feb. 10, 2021). Thereafter, on February 22, 2021, KPH filed an amended complaint. (DE 44) On April 6, 2021, the defendants filed a joint motion to compel arbitration (DE 51) and a joint motion to dismiss the complaint (DE 56). KPH filed briefs in opposition to both motions on May 6, 2021 (DE 63, 64), and defendants filed replies on June 7, 2021 (DE 70, 71).

## II. STANDARD OF REVIEW AND GOVERNING LAW

The threshold motion is the one to compel arbitration. "[W]hen it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard . . . ." *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386,

---

[6] The Janssen Agreement requires that actual arbitration be preceded by an attempt to mediate the issues. Both parties, however, present the issue to the Court as one of arbitration *simpliciter,* and neither asks the Court to compel, or deny compulsion of, mediation, which at this point may be futile. As KPH, by bringing suit, jumped the gun on both mediation and arbitration, and neither side refers to mediation in its briefs, I treat the issue as waived. I take no position as to whether the arbitrator may or should require mediation.

[7] Those cases are *Louisiana Health Service & Indemnity Co., et al. v. Janssen Biotech, Inc.*, et al., No. 2:19-cv-14146-KM-JBC and *Self-Insured Schools of California v. Janssen Biotech, Inc.*, et al., No. 2: 19-cv-1429 1-KM-JBC.

406 (3d Cir. 2020). Until a court determines whether arbitration should be compelled, judicial review is limited to two threshold questions: "(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall with the language of the arbitration agreement?" *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998); *see also CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014). Because neither party contests the validity of the Agreement, I assess only whether the disputes at issue fall within the scope of the Agreement's arbitration clause.

Generally, the arbitrability of a dispute is a question for judicial determination. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). What is more, New Jersey's Arbitration Act states that "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." N.J.S.A. § 2A:23B-6(b). Because neither party questions the propriety of this court determining whether the dispute is arbitrable, I assume, without further analysis, that the Agreement leaves the question of arbitrability to judicial determination. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts." *Moon v. Breathless Inc.*, 868 F.3d 209, 212–13 (3d Cir. 2017). Thus, in determining whether the dispute is arbitrable, I apply the law of this forum: specifically, the New Jersey law of contracts. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017).[8]

## III. DISCUSSION

### a. Scope of the Arbitration Agreement

The parties, in this as in in most contract issues, are the masters of their agreement. It follows that parties may agree to arbitrate some disputes but not

---

[8] The parties agree that application of New Jersey law is appropriate and that there is no substantial choice of law issue. (Mot. at 19 n. 12; Opp. at 4.)

others; an agreement to arbitrate a particular kind of dispute does not necessarily manifest an intent to arbitrate every dispute that might arise. *See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("parties are generally free to structure their arbitration agreements as they see fit"). Accordingly, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock*, 130 S. Ct. at 2856 (emphasis in original). Ultimately, then, "whether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim." *CardioNet*, 751 F.3d at 172.

Here, the arbitration clause is broad. I find that the clause, clearly and without ambiguity, covers KPH's claims against Janssen that are asserted in this action. The key phrase in the arbitration agreement states that it covers "any controversy or claim arising out of or relating to this Agreement."[9] New Jersey courts interpreting arbitration agreements have read "arising out of" as broad language, and "relating to" as broader still. *See Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc.*, 240 N.J. Super. 370, 375 (App. Div. 1990) ("An arbitration provision covering claims 'relating to' a contract is broader than one which covers claims merely arising out of a contract."); *Angrisani v. Fin. Tech. Ventures, L.P.*, 402 N.J. Super. 138, 149 (App. Div. 2008) (describing such language as "extremely broad"); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (stating that "in relation to" requires only some "logical or causal connection" between the dispute and the agreement); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 US 614, 617 (1985). "Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." *Curtis v. Cellco P'ship*, 413 N.J. Super. 26, 38 (App. Div. 2010).

---

9   KPH argues that a proper reading of that clause should be limited by the first sentence of the agreement. I disagree, as explained below.

What is more, courts have specifically found that antitrust overcharging claims under the Sherman Act "arise out of" (to say nothing of "relate to") a purchase agreement. *EPIX Holdings Corp. v. Marsh & McLennan Cos.*, 410 N.J. Super. 453 (App. Div. 2009), *overruled in part on other grounds by Hirsch v. Amper Fin. Servs.*, 215 N.J. 174 (2013); *see also In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 523 (3d Cir. 2019). The courts in *EPIX* and *Remicade* reasoned that if a plaintiff alleges in an antitrust claim that it was overcharged for a product, the extent of the overcharging cannot be demonstrated "without reference to, and reliance upon, the underlying contract." *Remicade*, 938 F.3d at 523 (quoting *EPIX*, 410 N.J. Super at 475).

*Remicade*, interpreting New Jersey law, held that an arbitration clause covering "[a]ny controversy or claim arising out of or relating to this agreement" required arbitration of antitrust claims. The arbitration clause in the Janssen Agreement is essentially identical, and the same reasoning applies here.[10] KPH claims that Janssen's unwarranted attempts to extend the duration of its patent monopoly caused KPH (or rather its assignor) to overpay for Zytiga. The only way KPH can show that it overpaid, however, is with reference to the Distribution Agreement between McKesson and Janssen—the very agreement which includes the dispute resolution clause. KPH's antitrust claims thus arise from the Distribution Agreement. *A fortiori,* they relate to, in the sense of having a logical or causal connection to, that Distribution Agreement.[11]

---

[10]   Janssen, as it happens, was a defendant in *Remicade*.

[11]   A close analogy is suggested by cases holding that, for purposes of a forum selection clause, antitrust claims are "related to" purchase agreements for the product at issue. *See Valspar Corp. v. E.I. DuPont de Nemours & Co.*, 15 F. Supp. 3d 928, 933–34 (D. Minn. 2014) (holding that forum selection clause in supply contract encompassed antitrust claims); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 858 (D. Md. 2013) (same); *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, 2020 WL 4605241, at *6–*7 (S.D.N.Y. Aug. 11, 2020) (holding that forum selection clause covering proceedings "arising out of or relating to" the agreement reaches plaintiff's antitrust claims).

KPH also argues that statutory claims, such as the antitrust claims here, fall outside the scope of the arbitration agreement. The generalized language of the agreement, says KPH, runs afoul of New Jersey case law requiring that waivers of litigation of statutory claims be explicit.[12] Those cited cases, however, are all in the employment or consumer context, not the complex commercial context of this case. The Third Circuit in *Remicade* rejected this very argument, holding that the New Jersey requirement that agreements to arbitrate statutory claims be particularly explicit did not apply in the context of such commercial contracts. *See* 938 F.3d at 525–26. Under *Remicade*, I find that the rule requiring explicit waivers of statutory rights does not apply to the Distribution Agreement. KPH's argument that the phrase "regarding this Agreement" is an implied carve-out of statutory claims is likewise inconsistent with *Remicade.* In the alternative, I would find that KPH's is not a natural reading of this language, which at most presents the kind of mild uncertainty that "must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019).

Alternatively, KPH argues that the first line of the dispute resolution clause limits the broad language in the remainder of the clause. (DE 54 § 4.16(a); Opp. at 6–14.) Essentially, KPH asserts that the initial sentence ("dispute[s] … regarding this Agreement") is a bottleneck; the later, operative language of the arbitration clause ("any controversy or claim arising out of or relating to this Agreement"), would therefore apply only to the subset of claims that had passed through that bottleneck. As a matter of plain-language contract interpretation, I disagree. Assuming *arguendo* that a "dispute . . . regarding this Agreement" is the narrower formulation, it does not limit the later language of the arbitration clause. That initial language delimits the scope

---

[12] (Opp. at 12–14) (citing, *e.g.*, *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 445 (2014); *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 168 N.J. 124, 134 (2001)). KPH also cites *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 96 (2002), which held that sufficiently broad and unambiguous language *did* waive statutory rights.

8

of issues as to which the parties must first engage in "good faith settlement discussions." Should those discussions fail, that limitation falls by the wayside; at that point, "*any* controversy of claim arising out of or relating to" the Agreement must be mediated, and, failing that, submitted to arbitration. As to arbitrability *per se*, that latter language is explicitly the operative clause.[13]

Here, KPH analogizes to the dispute resolution clause at issue in *CardioNet,* a case in which the Third Circuit declined to compel arbitration. 751 F.3d 165. (Opp. at 8.) Janssen, in contrast, argues that that the dispute resolution clause in this case is more similar to the one in *Remicade*, where the Third Circuit distinguished *CardioNet* and did compel arbitration. 938 F.3d 515. I agree with Janssen; *CardioNet* tends to confirm my plain-language analysis, *supra*, and supports the conclusion that the initial, informal-dispute-resolution clause does not limit the scope of the later, broad arbitration language.

In *CardioNet*, the relevant agreement read as follows:

> 6.3 *Internal Dispute Resolution.* Disputes that might arise between the parties regarding the performance or interpretation of the Agreement must first be resolved through the applicable internal dispute resolution process outlined in the Administrative Guidelines. …

---

[13] For convenient reference, I quote the Janssen Agreement clause again here:

> In the event of a dispute arising between the parties regarding this Agreement and prior to commencement of escalated action set forth below, the parties shall attempt in good faith to amicably resolve such dispute by good faith settlement discussions…. In the event the above settlement discussions are ineffective, any controversy or claim arising out of or relating to this Agreement between the parties (including without limitation any controversy or claim relating to this Agreement involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a "Dispute")), shall first be submitted to mediation. … Any Dispute that cannot be resolved by mediation… shall be resolved by arbitration.

> 6.4 *Arbitration.* If the dispute is not resolved through [defendant's] internal dispute resolution process, either party can initiate arbitration by providing written notice to the other…. Arbitration is the exclusive remedy for the resolutions of disputes under this Agreement.

*CardioNet*, 751 F.3d at 173. Reading those two interrelated sections together, the Court of Appeals found that the claims in the lawsuit did not involve "the performance or interpretation" of the agreement, and thus refused to compel arbitration. *Id.* at 174–75. There are two key differences, however, between the *CardioNet* agreement and the Janssen Agreement at issue here.

First, focus on the scope of the initial, informal-dispute-resolution language. The language in § 6.3 of the *CardioNet* agreement is significantly narrower than the initial sentence in the Janssen Agreement. The *CardioNet* agreement limits the internal dispute resolution process to "[d]isputes . . . regarding the *performance or interpretation* of the Agreement." 751 F.3d at 173 (quoting § 6.3; emphasis added). That language is narrower than the Janssen Agreement's requirement that the parties engage in settlement discussions over disputes "regarding *the Agreement.*" (DE 54 § 4.16(a) (emphasis added).

Second, consider the contrasting structures of the two agreements. The court in *CardioNet* emphasized that the first sentence of Section 6.4 "requires arbitration not of 'all' or 'any' disputes between the parties, but of only 'the dispute' that the parties failed to resolve through the internal process outlined in Section 6.3." 751 F.3d at 174. The actual arbitration clause, § 6.4, does not contain its own definition of what suits are arbitrable; its reference to "the dispute" is clearly an incorporation of *the same* dispute that was subject to informal resolution in the preceding § 6.3. Hence, *CardioNet* reasoned, "Section 6.4 mandates the arbitration of only those disputes subject to the internal dispute resolution process outlined in Section 6.3"—that is, disputes "regarding the performance or interpretation of the Agreement." *CardioNet*, 751 F.3d at 174. The Janssen Agreement, in contrast, does not embody such a bottleneck structure, as discussed above. It requires good faith discussion only

of disputes "regarding this Agreement." If such discussions fail, the parties are obligated to arbitrate (after attempting mediation). But the actual arbitration clause, unlike that in *CardioNet,* does not incorporate an earlier definition; it contains *its own, broader* definition of the issues that must be arbitrated—*i.e.,* "any controversy or claim arising out of or relating to this Agreement." (DE 54 § 4.16(a).) Thus, even if I were to find that the scope of the informal-dispute-resolution mechanism is limited to the extent suggested by KPH—which I do not—there still would be lacking any indication, as in *CardioNet,* that this first phrase should be read to limit the capacious language of the subsequent arbitration clause.

*Remicade* distinguished *CardioNet* based on an arbitration clause quite similar to the one at issue here. The *Remicade* clause provided that "[a]ny controversy or claim arising out of or relating to this agreement (including without limitation any controversy or claim involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a 'Dispute')) must first be submitted to mediation" and, if mediation fails, to arbitration. *In re Remicade*, 938 F.3d at 518. The Court of Appeals, as noted above, found that this language required antitrust claims to be arbitrated, because they were claims "arising out of or relating to" the agreement. *Id.* at 524–25. True, the *Remicade* clause lacks the initial step of the Janssen Agreement requiring good faith settlement discussions. For the reasons stated above, however, that is a distinction without a difference, because the initial requirement of settlement discussions does not limit the scope of the actual arbitration clause. The reasoning of *Remicade* dictates that, like the antitrust claims in *Remicade,* KPH's antitrust claims are covered by the arbitration clause.

An instructive contrast is supplied by cases in which a plaintiff's claims were found *not* to be covered by broad arbitration clauses. For example, in *Cavlovic v. J.C. Penney Corp.*, the Tenth Circuit held that an arbitration clause contained in a J.C. Penney credit card agreement that required the arbitration

11

of any claim "that relates in any way to your account" did not require the arbitration of claims relating to a false price advertising scheme. 884 F.3d 1051, 1054 (10th Cir. 2018). There, Cavlovic claimed that J.C. Penney had misled consumers by offering "discounts" based on illusory, inflated prices. That claim, the Court held, did not relate in any way to the "fortuitous" fact that Cavlovic happened to have a J.C. Penney credit card. *Cavlovic*, 884 F.3d at 1060 (quoting *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995)). Vitally, Cavlovic could bring her claims without any reference to the credit card agreement at all. *See NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008) (stating "if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement"); *EPIX*, 410 N.J. Super. at 475. Here, the contractual relationship between KPH (*i.e.,* McKesson) and Janssen is not simply fortuitous, and does not simply set forth a credit arrangement of payment for goods, but lies at the heart of the case. KPH cannot prove its claim or establish its damages without reference to the Distribution Agreement that both governs the terms of the purchases and contains the dispute resolution clause. No circumstances similar to those in *Cavlovic* undermine this Court's determination that KPH's antitrust claims relate to the Distribution Agreement and are covered by the dispute resolution clause.

Subject to the provisions of the Janssen Agreement, KPH's antitrust claims against Janssen must be arbitrated.

### b. Claims against BTG

BTG moves jointly with Janssen to compel arbitration. BTG, however, is not a signatory to the Distribution Agreement. If claims against BTG are to be found arbitrable, it must be by a different route.

#### 1. *Enforcement against non-signatories: Legal principles*

Courts have recognized that arbitration agreements can be enforced by non-signatories if "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract." *Arthur Andersen LLP v.*

*Carlisle*, 556 U.S. 624, 631 (2009) (internal quotation marks omitted); *see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (a non-signatory may be bound to an arbitration agreement if "under traditional principles of contract ... [the party is] akin to a signatory of the underlying agreement") (cleaned up); *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014). One such "traditional principle" of state law is equitable estoppel. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020).

Many courts have found that equitable estoppel allows a non-signatory to enforce an arbitration agreement against a signatory because of "the close relationship between the entities involved, ... the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *DuPont*, 269 F.3d at 199 (quoting *Thomson–CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 779 (2d Cir. 1995)).[14]

New Jersey law, however, requires more. In 2013, the New Jersey Supreme Court "reject[ed] intertwinement as a theory for compelling arbitration when its application is untethered to any written arbitration clause between the parties, evidence of detrimental reliance, or at a minimum an oral agreement to submit to arbitration.... Estoppel cannot be applied *solely* because the parties and claims are intertwined*." Hirsch v. Amper Fin. Servs.,*

---

[14] *See also Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("[E]quitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010) ("[A] non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.") (cleaned up).

*LLC*, 215 N.J. 174, 192–93 (2013) (emphasis added). What is more, it held that "the doctrine of equitable estoppel does not apply absent proof that a party detrimentally rel[ied] on another party's conduct." *Hirsch*, 215 N.J. at 174 (citing *Knorr v. Smeal*, 178 N.J. 169, 178 (2003)). Equitable estoppel "may be invoked in the interests of justice, morality and common fairness." *Sicily by Car S.p.A. v. Hertz Glob. Holdings, Inc.*, 2015 WL 2403129, at *5 (D.N.J. May 20, 2015) (quoting *Hirsch*, 215 N.J. at 188–89).

*Hirsch* did allow, however, that under New Jersey law, "arbitration may be compelled by a non-signatory against a signatory to a contract on the basis of agency principles." *Hirsch*, 215 N.J. at 192 (citing *Alfano v. BDO Seidman, LLP*, 393 N.J. Super. 560, 569–70 (App. Div. 2007). In so holding, *Hirsch* explicitly abrogated the reasoning of an earlier New Jersey Appellate Division case, *EPIX Holdings*, 410 N.J. Super. 453, which had had applied equitable estoppel based only on the intertwinement of claims and parties. *Hirsch,* 215 N.J. at 193. *Hirsch* approved the result in *EPIX*, however, finding that the lower court could properly have reached the same result by focusing "on the agency relationship between the parent and subsidiary corporations in relation to their intertwinement with the plaintiff's claims and the relevant contractual language." *Id.*

The upshot, then, is that New Jersey law offers two paths for a non-signatory to enforce an arbitration agreement: equitable estoppel and agency principles. That the claims and parties be intertwined is necessary, but not sufficient, to require arbitration. The equitable estoppel path requires, in addition, a showing of detrimental reliance on behalf of the party aiming to compel arbitration. The agency path does not require a showing of detrimental reliance, but has generally been applied only when a non-signatory parent company seeks to compel arbitration based on an arbitration agreement made by its subsidiary. *See Najmee v. Brownstones at Essex Fells, LLC,* 2014 WL 349486, at *7 (N.J. Super. Ct. App. Div. Feb. 3, 2014); *McLean v. HSBC Fin.*

14

*Corp.*, 2016 WL 5796865, at *3 (D.N.J. Oct. 3, 2016); *Alfano,* 393 N.J. Super. at 565; *DuPont,* 269 F.3d at 199.

### *2. Application to BTG*

BTG can compel arbitration of KPH's claims against it through equitable estoppel. I first find that BTG and Janssen have a close relationship, as licensee and licensor, and that the claims against both are fully intertwined. I then find that BTG detrimentally relied on Janssen's Distribution Agreement.[15]

In relation to Zytiga, Janssen and BTG have a close relationship. Janssen's licensing of BTG's patent made the creation of Zytiga possible. All of KPH's claims against BTG about its purchases of Zytiga are intertwined with—indeed, derivative of—its claims against Janssen. KPH alleges that the two corporations together violated the Sherman Act. (FAC ¶ 265–81.) KPH brings no claims solely against BTG. In fact, throughout almost the entire complaint, BTG is only mentioned as part of the pairing "Janssen and BTG."[16] The same facts that form the basis for KPH's claims against Janssen form the basis of its claims against BTG. *See Sakyi v. Estee Lauder Companies, Inc.*, 308 F. Supp. 3d 366, 385 (D.D.C. 2018) ("Throughout the Amended Complaint, the plaintiff

---

[15] Because I rely on equitable estoppel, it is not necessary to rule on the alternative agency theory. The New Jersey Supreme Court, examining these facts, could find that the licensee/licensor relationship between Janssen and BTG is analogous to the parent/subsidiary agency relationship. BTG, like a parent company, relied on Janssen to protect its interests. Insofar as BTG can be liable for the actions of Janssen, it should also receive the protections, namely the arbitration provision, that Janssen has put in place. To paraphrase *Alfano,* the court could find that "the purchase of the [Zytiga under the Agreement] was integral to [KPH's] pled causes of action; [KPH] must rely on the [Zytiga] transaction to assert [its] claims against [BTG]." 393 N.J. Super. at 569. Had KPH not purchased the drug under the Agreement, "no cause of action against any defendant would arise." *Id.* Accordingly, KPH cannot "circumvent the strong federal and state policy favoring the use of arbitration" and escape the arbitration clause in the Agreement by bringing claims directly against BTG. *Id.* at 570. Because BTG has demonstrated detrimental reliance, however, the agency relationship is noted here only as an alternative theory.

[16] The only time BTG is discussed separately is in connection with the complaint's allegations that BTG obtained an extension on the original patent. (FAC ¶ 120-23, 138.)

15

asserts the exact same claims, based on the same operative set of facts, against all three defendants, discussing the 'Defendants' generally without specifying which claims pertain to which defendant.") (cleaned up). What is more, KPH has no direct relationship with BTG whatsoever. *See Angrisani*, 402 N.J. Super. at 155 (reversing an arbitration order and finding that equitable estoppel did not apply where plaintiff had direct relationships with two different companies, only one of which included an arbitration agreement). The only way KPH is connected to BTG is through the Distribution Agreement that it signed with Janssen to purchase Zytiga. In fact, its assignment agreement with McKesson covers claims "only to the extent the cause of action arises from McKesson's purchase of Zytiga that were subsequently resold to Customer." (DE 52 ¶ 1.) As discussed above, there is no way for KPH to make its case against Janssen or BTG without reference to this agreement. *See Kelleher v. Dream Catcher, L.L.C.*, 278 F. Supp. 3d 221, 225 (D.D.C. 2017) ("where there would be no claim against the non-signatory defendant but for the contract, applying the doctrine of estoppel is appropriate"); *McLean*, 2016 WL 5796865, at *3 (finding that equitable estoppel applied where "Plaintiff's entire relationship with [defendant] arises out of the … Agreement"); *see also Am. Bankers Ins. Group, Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006). Thus, this inquiry overlaps with the above inquiry on whether antitrust claims are subject to arbitration. As in *Remicade*, I find that KPH's antitrust claims are "undeniably intertwined" with the Distribution Agreement. *In re Remicade*, 938 F.3d at 352.[17]

Thus, BTG has met the first prong of the equitable estoppel test and, if BTG can show detrimental reliance, equitable estoppel will compel KPH to arbitrate. I find that BTG did detrimentally rely on the Distribution Agreement. As licensor, BTG relies on Janssen to negotiate agreements to contract with distributors to sell drugs based on BTG's licensed patent. Part of that reliance

---

[17] KPH argues that, for the purposes of equitable estoppel, the antitrust claims cannot be intertwined with the distribution agreement because they are statutory claims. (Opp. at 18.) As discussed above, this argument is without merit.

is an expectation that Janssen will follow the fundamental duty of fair dealing and shield BTG from litigation to the same extent that it shields itself, not force BTG to litigate claims that Janssen can arbitrate. If I were to refuse to apply equitable estoppel and compel KPH to arbitrate its claims against Janssen but not against BTG, that would constitute a detriment to BTG.

The only response KPH makes to BTG's claim of detrimental reliance is to claim that BTG could not have relied on the distribution agreement because the terms of the agreement are confidential. (Opp. at 18.) This vague and conclusory statement is not evidence that BTG did not rely on Janssen to protect its interests while negotiating distribution agreements, even if it did not know every detail of every distribution agreement.

Thus, in the interests of justice and fairness, the doctrine of equitable estoppel applies here and requires that KPH arbitrate its claims against BTG.

### c. Waiver

KPH argues that, even if the dispute resolution clause covers its claims, defendants have waived their right to compel arbitration. (Opp. at 19–22.) I find that the defendants have not waived their right to arbitrate.

Waiver is the voluntary and intentional relinquishment of a known right. *W. Jersey Title & Guar. Co. v. Indus. Tr. Co.*, 27 N.J. 144, 152 (1958). The contractual right to arbitrate, like any other right, can be waived. It is up to the court, not the arbitrator, to determine if the right to arbitrate has been waived based on litigation conduct. *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 217–21 (3d Cir. 2007). "[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992). The Third Circuit has put forward a nonexclusive list of factors, known as the *Hoxworth* factors, to guide this court in determining whether a party has been prejudiced:

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a

17

> party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

*In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 117 (3d Cir. 2012). Waiver is "not to be lightly inferred." *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 232 (3d Cir. 1997). Generally, waiver will only be found where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration, *Ehleiter*, 482 F.3d at 222–23, and "where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery," *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1068–69 (3d Cir. 1995). Although two of the *Hoxworth* factors weigh lightly in favor of waiver, on balance the factors weigh heavily against waiver, and I therefore find that defendants have not waived their right to arbitrate. I address the *Hoxworth* factors in order.

First, KPH makes much of the fact that ten months elapsed between the plaintiff's filing of this action and the defendants' filing of a motion to compel arbitration. (Opp. at 20–21.) Some courts, it is true, have found that an unexcused delay of as little as ten months can bespeak waiver. *See In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118 (stating that a ten-month delay "sits at the low end of the cases in which we have found waiver"). In this case, however, the defendants have a good excuse: they were following the briefing schedule imposed by this Court, which was linked to procedural developments in a companion case. (DE 23.) Defendants' motion to compel arbitration was filed less than two months after class counsel was appointed in the related case, *Louisiana Health Serv. & Indem. Co.*, 2021 WL 486895. I will not penalize the defendants for adhering to the court's scheduling order. *See PaineWebber*, 61 F.3d at 1069. The first *Hoxworth* factor thus does not favor waiver.

Second, the defendants have contested the merits of KPH's claims by filing a motion to dismiss. (DE 56.) This forced KPH to produce a 32-page brief in opposition (DE 64), potentially prejudicing KPH by forcing it to expend time,

effort, and money that would not have been necessary if the matter had first been found arbitrable. *Ehleiter*, 482 F.3d at 224. The motion to dismiss, however, was filed on the same day as the motion to compel arbitration. Thus, Defendants' actions are very distinguishable from the "wait and see" approach of the defendant in *Hoxworth,* who received an unfavorable ruling on the merits and then moved to compel arbitration. *See Nino v. Jewelry Exch., Inc.,* 609 F.3d 191, 211 (3rd Cir. 2010) (finding no substantial prejudice when a motion to compel arbitration and a motion to dismiss were filed on the same day); *Ehleiter*, 482 F.3d at 224. This factor, to the extent it may weigh against compelling arbitration, does so only lightly.

Third, defendants did inform KPH in advance of their intention to pursue arbitration, albeit only on March 12, 2021, at a joint status conference. (Opp. at 20.) Although the defendants never filed an answer in this action, they could easily have informed KPH earlier by less formal means. It is unclear, however, that notifying KPH would have made any substantial difference. Unless they moved for and were granted relief from the briefing schedule, defendants still could not have moved to compel arbitration significantly sooner than they did. Any prejudice experienced by KPH as a result of not being informed sooner of defendants' plans is speculative.

Fourth, non-merits motion practice in this case was minimal. The only substantive motion preceding defendants' motion to compel arbitration was KPH's motion to appoint co-lead class counsel on May 21, 2020, which defendants did not oppose. (DE 6.) In contrast with cases in which courts have found waiver, there was no mediation, settlement discussion, or entry of a joint discovery plan. *See, e.g., Maher v. Northland Grp., Inc.,* 2019 WL 3245083, at *9 (D.N.J. July 19, 2019), *appeal dismissed*, 2020 WL 6153196 (3d Cir. July 28, 2020). What substantive discussions there were preceding defendants' motion to compel arbitration merely concerned coordination with the related cases. (E.g., DE 47.) This factor weighs against finding waiver.

19

Fifth, defendants complied with what the few pre-trial orders that were entered—most prominently, of course, the scheduling order that coordinated briefing with the related case. (DE 23.) This factor is neutral.

Sixth, discovery has not begun. This is the most significant factor. *PaineWebber Inc.*, 61 F.3d at 1068–69. Participating in substantial discovery, depending on the circumstances, may convey a strong intent to litigate the controversy in court rather than arbitration. Moving to compel arbitration after a plaintiff has spent a great deal of time and resources participating in discovery is often found prejudicial, and has led courts to find the defendant has waived its right to arbitrate. *See Maher*, 2019 WL 3245083, at *9-10; *Ehleiter*, 482 F.3d at 225–26. Here, the discovery process has not begun, and the defendants have taken no steps in that direction. This factor weighs strongly against finding waiver.

Together, although the second and third factor weigh lightly in favor of finding that Janssen waived its right to arbitrate, the other factors, especially the fourth and sixth, weigh heavily in the other direction. I thus find that Janssen did not waive its right to arbitrate this matter.

To sum up, KPH's antitrust claims against defendants arise out of and relate to the Distribution Agreement and are covered by the dispute resolution clause therein, which is not waived. Therefore, I must compel the arbitration of KPH's claims against both Janssen and BTG.

## IV.   CONCLUSION

For the reasons set forth above, defendants' motion to compel arbitration and stay this case (DE 51) is GRANTED. Defendants' motion to dismiss (DE 56) is denied as moot. A separate order will issue.

Dated: October 8, 2021

/s/ Kevin McNulty

**Hon. Kevin McNulty**
**United States District Judge**